# CHARLESTON.

## STATE *v.* WILLARD MURPHY.

Submitted October 25, 1921.    Decided November 1, 1921.

1.  WITNESSES—*Not Error to Permit Witness to Say That He Had Made Extrajudicial False Statement at Suggestion of Another Made in Defendant's Presence.*

    It is not error to allow a witness, who has made an extrajudicial statement which he admits was in conflict with the facts within his knowledge at the time, to give as a reason for such untrue statement the advice given him by another party in the presence of the person to be affected thereby, where it appears that the person whose interest may be affected was in such a position that he would in all probability have overheard the advice so given the witness. (p. 717).

2.  SAME—*Refusal to Permit Witness to Answer Question, Where Answer Has Been Previously Given, is Not Error.*

    It is not error to refuse to permit a witness to answer a question eliciting information which he has given in answer to a question previously asked. (p. 418).

3.  CRIMINAL LAW—*Refusal to Permit Witness to Answer Question in Particular Form Not Error, When Witness is Permitted to Answer in Different Form.*

    It is not error to refuse to permit a witness to answer a question in a particular form, even though the answer thereto is pertinent to the inquiry being conducted, when such witness is permitted to answer the same question in a different form. (p. 418).

4.  SAME—*Refusal of Misleading Instruction is Not Error.*

    Misleading instructions should not be given upon the trial of a case, and it is not error for the court to refuse to give an instruction the only effect of which would be to confuse or mislead the jury. (p. 419).

5. HOMICIDE—*Provocation from Sudden Passion, Reducing Homicide to Manslaughter, Must Arise from Physical Injury Inflicted or Attempted.*

   Provocation for the sudden passion which will reduce a homicide to voluntary manslaughter must arise from something more than a quarrel or altercation which consists of a warm contention in words or a dispute carried on with heat or anger. Such provocation can arise only from a physical injury inflicted or attempted. (p. 420).

6. SAME—*Refusal of Instruction that Sufficient Provocation Might Arise from Sudden Passion to Reduce to Voluntary Manslaughter Not Error.*

   It is not error, upon the trial of one charged with murder, to refuse an instruction, the effect of which would be to tell the jury that sufficient provocation might arise from a quarrel or altercation between the parties for a sudden passion which would reduce the offense to voluntary manslaughter. (p. 420).

Error to Circuit Court, McDowell County.

Willard Murphy was convicted of murder in the second degree, and sentenced to the penitentiary, and he brings error.

*Affirmed.*

*Litz & Harman* and *Joseph M. Crockett,* for plaintiff in error.

*E. T. England,* Attorney General and *R. A. Blessing,* Assistant Attorney General, for the State.

RITZ, PRESIDENT:

By this writ of error the defendant seeks reversal of a judgment sentencing him to confinement in the penitentiary of this state rendered upon the verdict of a jury finding him guilty of murder in the second degree.

Defendant was charged with the murder of one Harry Swain on the first day of May, 1920. It appears that the deceased, Harry Swain, lived in Pocahontas, Virginia, some fourteen or fifteen miles from the residence of the defendant in McDowell county, West Virginia, and that on the first day of May, 1920, Swain, together with a man by the name of Warburton, came to McDowell county for the ostensible purpose of procuring some whiskey. They arrived at the

home of the defendant Murphy about one o'clock in the afternoon of that day. Murphy had just left his house, but observing these men stopping there he returned, and Warburton and Swain ate dinner at Murphy's house. After dinner Murphy, Swain and Warburton, together with a young man by the name of John Patterson, went up the creek upon which Murphy's house was situate, to the residence of Mrs. Joe Freeman, and at that place a considerable quantity of whiskey was procured and placed in a handbag carried by Warburton. After leaving the Freeman residence upon their return it was suggested that they have a poker game. This was agreed to and the parties entered into the game. It appears that Patterson lost what money he had in a very short time and retired. Before this happened, however, a young man by the name of Walter Harman appeared upon the scene, and took part in the game for a short time. He, however, soon lost what money he had, and likewise retired. Swain, Warburton and Murphy continued to play until about six o'clock in the evening, at which time, it is stated by Warburton, Murphy had lost all of his money, while Murphy states that he had lost up until the last hand, but that on the last hand he won a pot having in it something over a hundred dollars, which practically made up his previous losses. Warburton states that when Murphy discovered that he had lost all of his money he asserted that the cards which were being used, and which had been furnished by Swain, were marked, and insisted that he would have his money back, and apparently with a view of enforcing his demand pulled his pistol from its holster and shot Swain, the bullet entering Swain's right shoulder and passing downward through his body, coming out at the back under the left shoulder blade. Warburton says that after this shooting Murphy drew the pistol upon him, and that he told Murphy that he might have whatever money he, Warburton, had; that he did pull out his money, and that Murphy took $110.00 of it, and allowed him to retain four dollars. Murphy does not agree with Warburton as to the manner in which the shooting occurred. He says that when the last hand was placed, and it was discovered that he had the highest hand

both Warburton and Swain attempted to secure the stakes, and that he likewise reached for the pot which he had won; that Swain thereupon shoved him away with his left hand and reached with his right hand to his hip pocket; that Swain continued to shove him away from the place where they were playing until he had gotten back to a point where he could go no further because of some bushes and undergrowth, and believing that Swain was attempting to pull his pistol from his pocket for the purpose of shooting him, he drew his pistol and shot Swain. After the shooting Murphy fired his pistol to attract the attention of someone with a view of taking the wounded man to a doctor. It appears that two young men came along on horseback in a short time, and the horse of one of these young men was secured and Swain placed thereon, and Walter Harman, a brother-in-law of Murphy, having come up in the meantime, got on the horse with Swain and took him to Murphy's house, Murphy, Warburton and the owner of the horse, a boy by the name of Dillon, following on foot. When they reached Murphy's house they took Swain off the horse, and found that life was extinct. He was then placed upon the ground in close proximity to the house. Warburton says that Murphy stated to him at the place of the shooting, "If Swain dies you die with him," and that when they got to Murphy's house and found that Swain was dead, in answer to a question from Murphy as to whether he knew who killed Swain he, Warburton, replied that he did not; that he made this statement in contradiction to the fact because he was afraid that Murphy would kill him, and further because Murphy's brother-in-law, Walter Harman, who was present at the time, advised him to agree with any statement Murphy made. Warburton desired to return to his home in Virginia, and Murphy got his brother-in-law, Walter Harman, to escort Warburton across the line into Virginia, the means of conveyance being the horse belonging to the Dillon boy and a horse owned by Murphy, Murphy furnishing Warburton ten dollars for the purpose of paying expenses. It then appears that Murphy went to the home of his brother a short distance away, where his wife and family were at the time; that

sometime during the night he went to his own residence and removed the body of Swain to a secluded place in the woods, placed it behind a log, and covered it over with leaves and other debris. Murphy said nothing of the shooting to anyone; neither did his brother-in-law, Walter Harman. After Warburton got back to Pocahontas he informed the chief of police of that town of the occurrence, and went with an officer to the town of Welch, the county seat of McDowell county, and communicated to the sheriff information as to the homicide. The sheriff sent a posse together with Warburton to the home of Murphy on the night of the third of May. Early on the morning of the fourth this posse entered Murphy's house before he was up and placed him under arrest. It appears that at the time he denied that he knew where Swain's body was. He says that the reason he did this was because he did not want his wife to know anything about the transaction. A short distance from the house, however, he told the officers in charge of him that he would take them to the place where Swain's body was secreted. He did lead them to the place and the body was removed. At the same time he also gave his version of the homicide. He was indicted in the Criminal Court of McDowell County, and on the tenth day of May, 1920, placed on trial, which trial resulted in the jury finding him guilty of murder in the second degree, and the court passing sentence upon that verdict. To this judgment the Circuit Court of McDowell County granted a writ of error, but upon consideration affirmed the same.

The first error assigned by the defendant is to the action of the court in sustaining demurrers to two pleas in abatement filed by him which charge the improper constitution of the grand jury making the indictment. Nothing is said in argument to support this assignment of error, nor is it insisted upon on this hearing. Apparently the defendant's counsel, upon consideration, deem it without merit, and we concur in this conclusion.

The action of the court in permitting the witness Warburton to testify that another witness, Walter Harman, told him shortly after the occurrence to agree to whatever Murphy

said, is assigned as error, for the alleged reason that the statement was not made in the presence of the accused. We do not consider this statement very material in any event. Warburton had admitted that he made a statement that he knew nothing about the homicide, and in explanation of this statement, which was in conflict with the facts, he stated that he made it through fear and because Harman told him to agree with whatever the accused wanted. The accused admits in his testimony that Warburton did know all about the homicide, being present at the time, and it is entirely immaterial whether or not Warburton made any explantation of his contradictory statement. But the ground of the objection is not well taken in any event, as it appears from the testimony of Warburton that the accused was present and within three or four steps of Harman when he made the statement, and while the witness says it was not made in a loud tone of voice, still it would be almost inconceivable that such a statement could be made under such circumstances without it being heard by one so close to the party making it. It is true Murphy says he did not hear it, and Harman says he did not make it, but if it be considered that it is at all material in the case, the fact of whether it was made, or whether Murphy heard it, was for the jury.

The defendant also assigns as error the action of the court in refusing to allow him to answer the following question propounded by his counsel: "At the time you shot, as you have testified to, did you think you were in danger of death or great bodily harm at the hands of Harry Swain or Warburton?" There is nothing in this assignment of error. The court's action in refusing to permit the witness to answer the question was evidently based upon the fact that it was leading and suggestive, and the further fact that the accused had already stated why he fired the fatal shot. In answer to a question theretofore asked him by his counsel as to why he shot Swain, he replied, "Simply because I thought he was going to shoot me." There was no error in the court refusing to allow him to again give his reason for shooting the deceased.

It is likewise assigned as error that the court refused to

allow the defendant to state that he was on a higher eleva-
tion than the deceased at the time he fired the fatal shot. It
is contended that the answer to this question would be very
material in view of the fact that the bullet entered at the top
of the right shoulder, and ranged downward through Swain's
body, indicating that the pistol ʹfrom which the shot was
fired must have been held above Swain's right shoulder.
This condition, of course, made .it very important to show
the relative positions of the parties at the time, particularly
in view of the accused's reliance upon self defense, and if
the court had refused to allow the defendant to give his ver-
sion of the relative positions of the parties, and the condi-
tion of the ground at the scene of the tragedy, it would have
been error. Upon examining the record, however, we find
that while the court refused to allow him to answer the ques-
tion about which complaint is made, he did permit and direct
the witness to answer a question in which he was asked to de-
scribe the ground at the place of the occurrence, and how he
and the accused were standing, and in answer to this question
he did fully elucidate this point. The accused had the ad- ·
vantage of everything that he would have had had he been al-
lowed to answer the particular question about which com-
plaint is made.

It is likewise objected that the court refused to allow the
defendant to testify as to whether or· not there was any per-
sonal feeling or grudge of any kind existing between him and
the deceased at the time of the tragedy. We find from an
examination of the record that the accused did testify that
there was no trouble or feeling of any kind existing between
him and Swain previous to the time of the occurrence. It is
true the court sustained an objection to the question in the
form in which it was first propounded, but counsel imme-
diately propounded it in a different form and elicited the
answer desired.

The action of the court in refusing to give to the jury the
following instruction offered on behalf of the accused is also
assigned as error. ''The court instructs the jury that the
fact that the defendant hid or concealed the body of deceased
cannot be considered by them in aggravation of the offense

with which he is charged." This instruction could not have
been of any assistance to the jury in reaching a correct con-
clusion upon the matters submitted to them for decision. It
tells the jury that the fact that Murphy hid the body of
Swain could not be considered in aggravation of the offense
with which Murphy was charged. The offense charged in
the indictment is murder in the first degree, and of course it
would be very difficult to aggravate an offense of that char-
acter. But even if it be said that the indictment also charges
the various degrees of homicide recognized by the law, and
that this instruction was meant to apply to those lower than
murder in the first degree, the query naturally arises, to
which one is it intended to apply? This evidence was admis-
sible as characterizing the acts of Murphy. His conduct in
hiding the body of his victim was the result of mental re-
action from the occurrence in which he had theretofore re-
cently engaged, and the mental attitude of a party during a
particular transaction is frequently accurately reflected by
his subsequent conduct. No purpose could have been ac-
complished in giving this instruction except to confuse the
jury, and perhaps indicate to them that in the opinion of
the court the fact that the body was concealed by the ac-
cused immediately after the occurrence was of no weight.

The court's refusal to give the following instruction is
also assigned as error: "The court instructs the jury that,
although you may believe from the evidence in this case that
at the time the defendant fired the shot resulting in the death
of Harry Swain, he the defendant, was not justified in so do-
ing in self-defense, yet if you further believe from the evi-
dence that at the time of firing the shot the defendant and
the said Swain were in a quarrel and altercation, that the act
was done by the defendant in passion and heat of blood on
sudden provocation, then you cannot find the defendant guilty
of any offense higher than voluntary manslaughter." This in-
struction attempts to give to the jury the law governing vol-
untary manslaughter, and it will be noted that it tells the
jury that if Swain and the accused were in a quarrel and al-
tercation, and that the shooting was done by the defendant in
passion and heat of blood on provocation, he would only be

guilty of voluntary manslaughter. The instruction does not tell the jury what provocation will reduce a homicide to voluntary manslaughter except inferentially. By necessary inference it does say that if the accused was provoked into a sudden passion by a quarrel or altercation in which he and the deceased were engaged, that would reduce the shooting to voluntary manslaughter. It is quite well established that no provocation arising from mere words, however violent or insulting, would reduce a homicide to voluntary manslaughter. *State* v. *Crawford,* 66 W. Va. 114, and authorities there cited. There must be some actual affray, some physical encounter which excites passion to constitute such provocation. If the court had given this instruction he would have said in effect to the jury that anger or passion arising from a quarrel or altercation which consists of nothing more than a contention by words may be sufficient provocation to reduce a homicide from murder in the first or second degree to voluntary manslaughter. In this case the vice of such an instruction is apparent. According to the testimony introduced by the state, there was no affray or physical encounter between the parties, nothing more than some contention by words, entirely insufficient to furnish provocation for a sudden passion which would reduce the offense to voluntary manslaughter, but the effect of this instruction would have been to tell the jury that this contending by words might furnish such provocation.

Upon the whole case it appears that the accused has had a fair and impartial trial before the tribunal constituted by law for that purpose, and we see no reason for disturbing the judgment complained of. It is, therefore, affirmed.

*Affirmed.*